## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

100PLUSANIMAL RESCUE, INC. DBA
100+ ABANDONED DOGS OF
EVERGLADES FLORIDA,

      Plaintiff,                  CASE NO.:

vs.

MRS. DARCY ODE BUTKUS A/K/A
DARCY BUTKUS AKA "INSPECTOR
BARK"

      Defendants.
_____/

## COMPLAINT

Plaintiff, 100PLUSANIMAL RESCUE, Inc. DBA 100+ ABANDONED DOGS OF EVERGLADES FLORIDA (hereinafter "100+ Abandoned Dogs"), by and through the undersigned counsel, hereby files this Complaint and sues Defendant DARCY ODE BUTKUS aka Darcy Butkus aka "Inspector Bark" (hereinafter "Darcy Butkus" or "Butkus") and in support thereof alleges the following:

### A.      PARTIES, JURISDICTION & VENUE

1.      This is an action for defamation (Slander and Libel Per Se) and damages vastly in excess of $75,000.00, exclusive of interests, costs, and attorney's fees.

2.      Plaintiff 100+ Abandoned Dogs is a Florida Not for Profit Corporation with its headquarters in Broward County, Florida.

3.      Defendant, Darcy Butkus is an individual over the age of 18 who is *sui juris* and resides in Cumming, Forsyth County, Georgia.

4.      The events that gave rise to this Complaint first took effect in Broward County, Florida.

**B.      GENERAL ALLEGATIONS COMMON TO ALL COUNTS**

5.      100+ Dogs is a 501(c)(3) nonprofit animal rescue.

6.      100+ Dogs is fully dependent on community support to fund its rescues and veterinary bills for its charitable purpose of rescuing abandoned or displaced animals.

7.      Likewise, 100+ Abandoned Dogs heavily relies upon grassroots volunteers to operate.

8.      Amy Roman works full time as 100+ Abandoned Dogs' President to the exclusion of all other employment.

9.      As Amy Roman commits all of her time to the charitable mission of 100+ Abandoned Dogs, it is necessary that 100+ Abandoned Dogs compensate Mrs. Roman. Still, as 100+ President, Mrs. Roman earns a modest salary that recently was below the living wage for a single adult per Massachusetts Institute of Technology Living Wage Calculator.

10.      Mrs. Roman routinely works far in excess of 40 hours a week in the furtherance of 100+ Abandoned Dogs' charitable mission. Mrs. Roman spends much of this time rescuing animals from horrific conditions in impoverished and dangerous neighborhoods and in hot and humid wetlands infested with ticks, fleas, giant mosquitos, water moccasins, alligators and other wildlife.

11.      Prior to the defamation of 100+ Abandoned Dogs by Defendant Butkus, 100+ Abandoned Dogs had a reputation as being one of best and most effective animal rescues in South Florida.

2

12.     In this vein, prior to the defamation of 100+ Abandoned Dogs by Defendant Butkus, 100+ Abandoned Dogs had a reputation for and was publicly recognized by preeminent animal rescue organizations for exemplary work in saving abandoned animals, to wit:

    a.    The international chapter of The Society for the Prevention of Cruelty to Animals (SPCA), an internationally renowned advocate for animal rights, awarded Plaintiff $1,500.00 in grants for its work in animal rescue. In the same vein, the SPCA praised Plaintiff 100+ Abandoned Dogs stating, "We have been really impressed with her [President Amy Roman's] work. It's a difficult job. It's dangerous and it takes a lot of effort."

    b.    Cherie Wachter, a spokeswoman for the Humane Society of Broward County, applauded Roman's work. . . "Thank goodness there are rescue groups stepping up to help these animals – because they can't help themselves."

13.     Prior to the defamation of 100+ Abandoned Dogs by Defendant Darcy Butkus, the outstanding reputation and exemplary work of Plaintiff 100+ Abandoned Dogs and 100+ Abandoned Dogs President, Amy Roman, were wildly reported in both the local and national media:

a.     On December 19, 2011, the New Times reported in pertinent part:

The past four months have been a horror show for local animal rescuer Amy [Roman]. Along with a group of volunteers, she has spent every weekend in rural South Dade rounding up dogs – all of them former pets abandoned on the edge of the Everglades by feckless owners. When she finds the animals, they're usually emaciated and sick from being tossed to the streets. "Some of them have needed leg amputations," [Roman] says. "They have missing eyes. They have infections."…

b.      On February 3, 2012, NBC 6 South Florida reported in pertinent part:

Amy [Roman] needs help from people who want to adopt dogs and make donations. Amy [Roman] had heard stories of abandoned animals in Homestead, Redland and the Everglades. She went south from her Palm Beach County home with other pet lovers, and first discovered a starving pit bull last September. "It was so bad, we couldn't turn our backs on it," she said. Since then, [Roman] spends most weekends searching for abandoned animals in south Miami-Dade County…In October, [Roman] found a starving dog in an abandoned home in Homestead, and named him Midnight. In January, she made arrangements to take him to a veterinarian who specialized in behavior therapy because the dog has become aggressive. "This is my full time job. This is what I do," said [Roman], who works for an animal advocacy agency, but rescues dogs and cats on her own time. "We really need help," she said.

c.      On March 20, 2012, the National Enquirer substantially reported of 100+

Abandoned Dogs and its founder Amy Roman:

WOMAN BATTLES EVERGLADES MENACES TO SAVE PETS! Cruel pet owners are abandoning dogs by the hundreds to face alligators and other deadly creatures in the Florida Everglades – and AMY [ROMAN] has come to the rescue… During… trips to the Everglades, Amy came upon dozens of starving dogs who would creep out of the swamp to drink the water and eat the food that she brought. As she began to rescue them, Amy realized she was taking on a huge task. She started a Facebook page – 100+ Abandoned Dogs of Everglades Florida... Animal lovers responded and Amy raised more than $100,000 to support her cause. "I was so thankful. The medicine and treatments to get these dogs healthy is expensive and then there's the cost of boarding," said Amy. As word of her rescue effort spread, Amy began getting calls 24 hours a day from people who spotted abandoned dogs in the Everglades. Not every dog survives. "Once we found a litter of pups. We took a few to the car. When we went back for the others they were gone. Who knows how many dogs are being eaten by alligators or pythons?"…

d.      On May 28, 2013, the Sun-Sentinel reported in pertinent part:

Six small puppies cluster together, whimpering on the side of a dirt road east of the Everglades. They have no food. No shelter from the mid-day sun. And no mother. Locals say they found her shot dead in a nearby field the night before.  A van pulls up. Out steps Amy Roman, founder of 100+ Abandoned Dogs of Everglades Florida, and core team member Carol Daniello, rushing to the puppies with food and water. Their mission: to rescue as many dogs as they can. . . [The] SPCA International officials became aware of Roman's work a year ago and have since awarded her $1,500 in grants. "We have been really impressed with her

work, "[SPCA spokeswoman Stephanie Scott] says. "It's a difficult job. It's dangerous and it takes a lot of effort." . . . "That's the hard part – finding homes," Roman says. Sometimes it takes as long as a year. "We find homes for every single one of them," Roman says. . .

e. On June 3, 2013, the Sun-Sentinel reported in pertinent part:

Dog rescuer Amy Roman led more than 150 animal lovers Sunday on a trip to the edge of the Everglades in search of homeless canines. The founder of 100+ Abandoned Dogs of the Everglades Florida and her entourage returned to Broward County with 23 dogs, including a starving golden retriever and four 12-day-old puppies infested with ticks and fleas. . . "We scooped up every dog that would allow us to," Roman said of the rainy excursion to the rural parts of southern Miami-Dade County. "We were soaked, walking through the trenches chasing after a pregnant dog. Couldn't catch her.". . . "We've got our hands full," Roman said. "I was pulling ticks out of ear canals until 7 p.m. And now the real work begins. We've got to get them homes." Cherie Wachter, a spokeswoman for the Humane Society of Broward County, applauded Roman's work. . . "Thank goodness there are rescue groups stepping up to help these animals – because they can't help themselves," Wachter said… Roman relies on YouTube and social networking sites to help find homes for the dogs.

f. On May 1, 2012, in a blog titled, "Paws Up for Pets, Pet Hero' throws herself into rescue efforts," The Costal Star reported in pertained part of 100+ Abandoned Dogs and its founder Amy Roman:

Meet Amy [Roman]... who never complains when she makes the trek down I-95 in bumper-to-bumper traffic from her West Palm Beach home to rural Miami. She doesn't mind the drive because she possesses an unparalleled drive when it comes to rescuing abandoned, skinny strays roaming the Everglades and rural, impoverished areas in South Miami-Dade County. Her life took a dramatic turn last September when she agreed to drive down to rural Homestead with a friend to help feed some hungry, homeless dogs…she spotted an emaciated pit bull with a rope dangling around her neck. She looked closer and noticed bite marks and wound scars. She then saw giant-sized mosquitoes swarming the dog, unsteady on her feet…recalls [Roman]… "something just clicked inside me. I remember screaming to my friend, 'We can't leave her! We just can't leave this dog!'" . . .It marked the start of [Roman's] single-focused quest to rescue and find homes for stray dogs… [Roman's] efforts are making headlines. She was the first recipient of the Pet Hero accolade presented by The National Enquirer. . . She had been profiled in daily newspapers and other media outlets… "With everything I've seen, our cause should be called 1,000 Plus, not 100 Plus. Dogs on the street starving to death. Dog-fighting rings. Distemper outbreaks. Yes, we can rescue dogs, get them healthy and find them good homes, but the real solution is to offer

free spaying and neutering for dogs in this poor area and to educate the uneducated. This is my calling. I'm going to be there for these animals."

g.  On November 6, 2014, Coral Springs Talk, published a blog substantially

reporting

Calls arrived this morning to the Broward Sheriff's Office in Parkland reporting an abandoned puppy at Barkland Dog Park. The mixed breed puppy apparently had been thrown over the fence during the night. The puppy, believed to be about three months old, was shivering, fearful, and suffering from a skin condition which may have been the result of neglect by its previous owner. Parkland deputies transported the puppy, now called Sara, to Imperial Point Animal Hospital for treatment before she moves on the care of 100+ Abandoned Dogs of Everglades Florida.

h.  On February 2, 2016, WPLG Channel 10 Miami reported substantially both on its

television broadcast and, in pertinent part, on its website:

A woman is facing felony animal abuse charges after the death of nine of 10 puppies in her care were found living in deplorable conditions. Miami –Dade police said officers responded to what appeared to be an abandoned home . . .. they were met by . . .. who claimed she was being followed by an animal rescue group that was offering her $700 for her boxer/American Bulldog mix . . .four of the six adult dogs were inside shopping carts and the boxer/bulldog mix was tethered on a short metal chain that was tied to a window fixture. . . [S]ome of the dogs appeared to have injuries and all appeared to be malnourished. A white poodle named Max was found in a shopping cart in a bedroom. . . the dog's fur was matted, unkempt and appeared to have dry blood on it. . . the dog appeared to have an eye infection and discharge coming from both eyes. . . ***All of the dogs have since been released to the rescue group 100 Plus Abandoned Dogs of Everglades Florida***.

[Emphasis added.]

i.  On February 2, 2016, WPLG Channel 10 Miami substantially reported on

its television broadcast and, in pertinent part, on its website:

Veterinary specialist worked all night to make sure Buster the dog made it. Blistered all over with only patches of hair – the estimated 1-year old dog was sedated at the Lauderdale Veterinary Specialist in Fort Lauderdale. "He's been completely out, sedated for the pain oozing blood and puss, emaciated . . . looking into his eyes you want to tear your heart out of your

chest to see a dog in such condition," said Dr. Lynel Tocci… Buster's lucky moment arrived when volunteers [of] the organization (100+ Abandoned Dogs) went to the shelter and brought him to the veterinary specialist clinic. . . "We have no pride. We need donations for him and for his care. We don't know what we're up against. We take it one day at a time," said Roman.

j.      On February 21, 2015, CBS Local reported in pertinent part:

A dog found shot and neglected is getting some desperately needed care thanks to a South Florida rescue group. . . The rescue organization 100+ Abandoned Dogs of Everglades Florida received a call about her and went to pick her up. "Valentine was shot twice and then went to get up and got hit by a car, explained Amy Roman with the rescue." "We drove out of the middle of nowhere by 11:30 we had her in our car screaming in pain." Rescuers rushed her to Lauderdale Veterinary Specialists . . . X-ray shows a bullet fragment near Valentine's spine. The two-year-old dog had a broken hip and is covered in scars. After surgery, she's recovering. . .

k.      On January 5, 2016, nbcmiami.com reported in pertinent part:

Animal advocates are keeping watch over three little puppies and their mother, after they said the mother was used for only breeding and was so improperly cared for she was emaciated. A four-week-old American Bulldog puppy whimpered inside Imperial Point Animal Hospital in Oakland Park where it received a life-saving blood transfusion. Animal advocates rescued three tick-infested puppies after they were allegedly bought from a breeder in Miami… Amy Roman runs an animal rescue group called 100+ Abandoned Dogs of Everglades Florida. She picked up the puppies from the person who bought them on Craigslist Sunday, hoping to save them. . . The dogs were being constantly brushed for ticks and then will be treated for worms…

l.      On March 24, 2015, the New Times reported in pertinent part:

After being rescued March 10 from a vacant building, her eyes so infected they needed to be removed, Frances the dog is showing off a vibrant and affectionate personality. "She smiles from ear to ear…," said Amy Roman, president and founder of 100+ Abandoned Dogs of Everglades Florida… it was representatives of 100+ Abandoned Dogs of Everglades Florida that took the most effective action. They freed the emaciated, tick-plastered dog from the heavy chain and brought her to a veterinary office in Fort Lauderdale. One eye was bulging and the other eye had previously ruptured and healed without sight, said Stephanie Palmer of VCA Imperial Point Animal Hospital. The eye damage may be from trauma, such as a

beating injury, Palmer said. . . the rescuing organization is focused on seeking a loving and safe home for Frances.

14.     Defendant Butkus has a demonstrative history of apparent mental illness that impairs the Defendant's ability to tell fact from fiction. In that regard, the Defendant apparently believes that she is God, or that she is on a mission from God to destroy Plaintiff 100+ Abandoned Dogs and 100+ Abandoned Dogs' President and founder Amy Roman.

15.     On or about April 13, 2014, the Davie Police Department "Baker Acted" Defendant Butkus after observing Defendant Butkus acting in a bizarre and delusional manner.

16.     Specifically, the Davie Police reported the following observations regarding Defendant Butkus:

a.   The police were dispatched after Defendant Butkus called the Davie Police Department indicating her belief that "she is God."

b.   Per Defendant Butkus' husband, Defendant Butkus was acting in a delusional manner.

c.   Per the Defendant Butkus' husband, Defendant Butkus was acting delusional and arguing with God over things that he wanted Defendant Butkus to do.

d.   Defendant Butkus was naked and pacing back and forth screaming out loud that "She does not want to do it!"

e.   Upon observing the responding to the police officer, Defendant Butkus turned to the officer and screamed, "No, I am not going to do that to her!"

  f. Upon the Davie Police Officer asking Defendant Butkus to put clothing on, Defendant Butkus stated, "God wants me this way!" and screamed and chanted, "I am God and I am going to do it!"

  g. Defendant Butkus agreed that she had neglected to care for herself and without evaluation she is likely to hurt herself and/or others.

17. After Defendant Butkus was "Baker Acted" as described above, Defendant initiated a malicious and delusional campaign to destroy Plaintiff 100+ Abandoned Dogs and its President and founder Amy Roman as Defendant Butkus openly and notoriously declared it was Defendant Butkus's mission to "Bring down the Roman Empire," to wit:

  a. On January 13, 2017, Defendant's "Dog Rescues –The Good-The Bad-And the Ugly South Florida" Facebook page, Defendant Butkus gloat, "The Roman Empire is starting to fall, brink (sic) by brink (sic)! Take a look!"

  b. On January 15, 2017, on Defendant Butkus' Facebook post, Defendant Butkus wrote, "Time to take down the 'Roman' Empire."

  c. On or about February 1, 2017, on Defendant Butkus' Blog Talk Radio "Inspector Bark" show, Defendant Butkus declared, "the Roman Empire is Starting to Fall."

18. Upon information and belief, as part of Defendant Butkus' delusional messianic campaign to "Bring Down the Roman Empire," Defendant Butkus initiated a complaint with the Florida Department of Agriculture and Consumer Services concerning Plaintiff 100+ Abandoned Dogs falsely claiming that Plaintiff 100+ Abandoned Dogs and Plaintiff's President and Founder Amy Roman were, for the personal enrichment of Amy Roman, stealing and/or misappropriating money from

Plaintiff 100+ Abandoned Dogs' 501(c)(3) bank accounts containing donated funds earmarked for Plaintiff 100+ Abandoned Dogs' charitable mission of rescuing abandoned animals.

19.    Defendant Butkus was privy to the investigation of Plaintiff 100+ Abandoned Dogs by the Florida Department of Agriculture and Consumer Services.

20.    At all times material hereto, Defendant Butkus was aware that the Florida Department of Agriculture and Consumer Services made no findings that 100+ Abandoned Dogs committed a "scam" or embezzled or stole money intended for 100+ Abandoned Dogs' charitable purpose of rescuing animals.

21.    Rather, as reflected in the lenient treatment of Plaintiff 100+ Abandoned Dogs in the Settlement Agreement with the Florida Department of Agriculture and Consumer Services, and the statements and evidence submitted by Plaintiff 100+ Abandoned Dogs, at all timed material hereto, Defendant Butkus knew, or should have known, that the Settlement Agreement between the Florida Department of Agriculture and Consumer Services represented nothing more than concerns about possible inadvertent failures to comply with technical rules governing charitable organizations that occurred during the very earliest and most inexperienced years of Plaintiff 100+ Abandoned Dogs' existence, if such technical non-compliances occurred at all.

22.    At all times material to this action, Defendant Butkus knew and understood that where a person juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts, she may be held responsible for the defamatory implication.

23.     Notwithstanding the foregoing, by omitting information and misstating facts Defendant Butkus maliciously and with wanton disregard for the truth or falsity of her statements made the following false and defamatory implications and/or statements concerning 100+ Abandoned Dogs.

24.     Circa May of 2017, Defendant Butkus posted Amy Roman's personal bank account and/or credit card information on Defendant Butkus' Facebook page.

25.     Defendant Butkus transposed over Amy Roman's personal bank account and/or credit card statements numerous misleading and defamatory remarks that implied Amy Roman was stealing, misappropriating, and/or embezzling funds belonging to Plaintiff 100+ Dogs for 100+ Abandoned Dogs' President Amy Roman's personal enrichment or purposes, to wit:

a.     On the foregoing Facebook post Defendant Butkus highlights several itemized restaurant transactions from Amy Roman's ***personal account*** implying and or overtly alleging dishonesty and theft on the part of 100+ Abandoned Dogs President, Amy Roman and Plaintiff 100+ Abandoned Dogs from the 100+ Abandoned Dogs' account, stating in pertinent part:

> Daily Dining for one or more people being paid out of ***rescue funds,*** wouldn't this money be better spent helping the animals? You will notice the frequenting of Places like Tee Jay (Thai and Sushi), Dunkin Donuts, California Pizza Kitchen, La Bamba amongst others. . . This does not appear to be meals on the road but ***daily meals paid out of donation funds*** as almost all locations are within the Fort Lauderdale area. . ."

[Emphasis added.]

b.     On the foregoing Facebook post Defendant Butkus likewise highlights numerous retail store transactions from 100+ Abandoned Dogs' President Amy Romans' personal bank account and/or credit card account and falsely implies or states that the

transactions were conducted on Plaintiff 100+ Abandoned Dogs' 501(c)(3) corporate accounts. Specifically, Defendant Butkus writes in pertinent part, "The various transaction (sic) listed below seem to mainly be personal expenses. Pier 1, Car washes, bed bath and beyond, Bath and body works, Home Depot, Encore Interiors, Trupanion (likely personal pets of the rescue president) Car repairs to name a few."

26.     Clearly, there is nothing illegal, dishonest, or immoral regarding paying for personal expenses out of a personal bank account, or credit card account.  To advance her malicious and obsessive agenda to "bring down the Roman Empire" and destroy Plaintiff 100+ Abandoned Dogs and its reputation, however, Defendant Butkus intentionally creates a false implication that Plaintiff 100+ Abandoned Dogs and Amy Roman willfully and dishonestly misappropriate funds.

27.     To create this false and defamatory implication that Plaintiff 100+ Abandoned Dogs is perpetrating a "scam," Defendant Butkus publishes Amy Roman's personal financial information and falsely implies and/or states that Amy Roman's personal financial accounts belong to Plaintiff 100+ Abandoned Dogs. As such, to maliciously defame Plaintiff 100+ Abandoned Dogs, Defendant Butkus willfully, intentionally, and dishonestly omits and conceals from the public that the personal expenses highlighted and listed on Defendant Butkus' Facebook page are made from President Amy Roman's personal financial accounts, not Plaintiff 100+ Abandoned Dogs' charitable corporate accounts.

28.     Likewise, Defendant Butkus knew or should have known that to the extent 100+ Abandoned Dogs reimbursed 100+ Abandoned Dogs President Amy Roman for

monies spent from Amy Roman's personal financial accounts, such expenses were related to the Plaintiff 100+ Abandoned Dogs' charitable cause.

29.     On Defendant's "Good Bad and the Ugly" Facebook page, Defendant discusses, a deceased dog named Taco, which Plaintiff 100+ Abandoned Dogs "never laid hands on," but for which kept a donation button up for 3 and a half months after Taco's death.

30.     Here, Defendant Butkus falsely and maliciously implies that 100+ Abandoned Dogs is defrauding the public by collecting donations for dead animals. Defendant Butkus knows that in actuality Plaintiff's website is bifurcated: the left side of the page, where the "donation button" resides, is fixed and does not move. The right side of the page, however, scrolls up and down so that one can page down to read previous posts. As such, Defendant Butkus knows, or should know, that Defendant or one of Defendant's agents paged down on the right side of Plaintiff's website until an old post about Taco appeared parallel with the fixed "donate" button on the left side of the screen and then took a screen shot of same to make it appear as if Plaintiff 100+ Abandoned Dogs was asking for donations for the small, deceased Chihuahua Taco.

31.     On Defendant Butkus' Dog Rescues the Good-The Bad- And the Ugly Facebook account, Defendant Butkus makes false defamatory implications regarding Plaintiff 100+ Abandoned Dogs' level of care related to the safety and welfare of one of Plaintiff's 100+ Abandoned Dogs' volunteers.

32.     Plaintiff 100+ Abandoned Dogs, like most charitable dog rescues, heavily relies upon the help of volunteers. As such, any attempt by Defendant to falsely imply, or

13

suggest that 100+ Abandoned Dogs mistreats its volunteers, or throws them "under the bus" is extremely damaging to the Plaintiff and highly defamatory.

33.     In this regard, under Defendant Butkus' Dog Rescues the Good the Bad and the Ugly Facebook account, Defendant Butkus falsely states, "they [Plaintiff 100+ Abandoned Dogs] threw [a volunteer] under the bus and sided with the 5 feral dogs! Nice way to back up a volunteer that traveled several hours to go get little Taco, only to be told she is dead to them if she tells what really happened."

34.     In this regard, the Defendant is referring to an incident involving a 100+ Abandoned Dogs volunteer who, due the volunteer's carelessness, was apparently bitten by several dogs. As such, at all times material hereto, Defendant Butkus knew that Defendant Butkus' statements were false, or created a false and defamatory implication as the Defendant knew, or should have known that, related to the incident wherein the Plaintiff allegedly threw its volunteer "under the bus," an eyewitness observed, "I do not think these dogs are aggressive. I think the dogs were being protective of the son [of the property owner] and the property they live on, as most dogs would be in that situation."

35.     As such, Defendant Butkus knows that the allegedly "feral" dogs Defendant Butkus comments about were not roaming free in the streets. They were home. They were behind a chained-closed barbed wire fence adorning a "Beware of Dog" sign.

36.     Likewise, notwithstanding Defendant Butkus' allegation that Plaintiff 100+ Abandoned Dogs threw its volunteer "under the bus," Defendant Butkus knows that 100+ Abandoned Dogs volunteer Jennifer Alexander stayed with her co-volunteer at the hospital for 21 hours and only left when the injured volunteer's mother told Ms. Alexander to go home because she, the injured volunteer's mother, had her friend

coming. As such, Defendant Butkus is aware that Ms. Alexander indicated that "I stayed with her for as long as I could."

37.       However, because 100+ Abandoned Dogs volunteer Alexander's 21-hour vigil by the injured volunteer's bedside is highly inconvenient to the false claim and implication that Plaintiff 100+ Abandoned Dogs throws its volunteers "under the bus," Defendant Butkus omitted any reference to Ms. Alexander's actions as a 100+ Abandoned Dogs representative when Defendant Butkus falsely implies or claims that Plaintiff 100+ Abandoned Dogs abandons its volunteers.

38.       On or about February 1, 2017, Defendant Butkus, under her self-aggrandizing alter ego "Inspector Bark," posted a two-hour podcast with the false and defamatory title, "100+ ways to scam! And NOT get away with it! 18 months it took!"

39.       Remarkably, it was pointed out to Defendant Butkus that "scam" has a particular meaning that attributes a person and organization with a dishonest and loathsome character that goes way beyond alleged incompetence. As such, Defendant Butkus was advised that Merriam-Webster defines "scam" as a fraudulent act. Still, evidencing Defendant Butkus' intentional malice, Defendant Butkus made no effort to modify or retract the allegations set forth in Defendant's "Inspector Bark" podcast.

40.       Notwithstanding the foregoing, at all times material hereto and before attributing Plaintiff 100+ Abandoned Dogs with a "scam" based upon Plaintiff 100+ Abandoned Dogs' Settlement Agreement with the Florida Department of Agriculture and Consumer Services, which took "18 months," Defendant Butkus knew there was nothing in the Settlement Agreement to suggest that Plaintiff 100+ Abandoned Dogs committed a

"scam," as Defendant Butkus boldly implies and declares in title of Defendant Butkus'
February 1, 2017 podcast.

41.     In that context, this exchange between Sasha Velez, Senior Financial
Investigator of Regulatory Investigation, Office of Regulatory Investigation Section,
Office of Agricultural Law Enforcement, Florida Department of Agriculture and
Consumer Services and Defendant Butkus and/or Defendant Butkus' co-host during the
very same February 1, 2017 podcast is remarkable:

Ms. Velez:              Our purpose obviously is to make sure that businesses or
                        organizations are compliant with the state statute . . . There's ***so
                        many quirks and so many little things*** you have to look for and
                        ***we do have to educate the public***…***a lot of people don't
                        understand*** that there are some things you can and can't do. You
                        just have to be ***careful*** on how you do it . . .

Ms. Velez:              …And I'm not saying something is wrong, just because you
                        report it doesn't mean that somebody is defiantly doing
                        something wrong

"Inspector Bark":       Sure. Sure.

Ms. Velez:              But at least it gives us a heads up we can at least take a look. If
                        nothing comes of it nothing comes of it. But at least we get a
                        chance to look at it and figure it out one-way or another.

"Inspector Bark":       Sure, ***and it might be they did something incorrect, something
                        they won't be doing again once they get notified***.

Ms. Velez:              Exactly.

[Emphasis added.]

42.     Remarkably, during the same February 1, 2017 podcast and elsewhere,
Defendant Butkus implies that Plaintiff 100+ Abandoned Dogs' President Amy Roman is
guilty of unethical, illegal, and/or dishonest conduct based upon the fact that Amy Roman

takes a relatively meager salary for the extraordinary numerous and full-time hours Amy Roman devotes to the rescue mission.

43.    That said, in willful and wanton disregard for the falsity of Defendant Butkus' defamatory implications concerning Plaintiff 100+ Abandoned Dogs and its president Amy Roman, Defendant Butkus ignores the advice of her own guest/CPA accountant specializing in 501(c)(3) corporations after Defendant Butkus' CPA guest informs Defendant Butkus that it is common and, in fact, sometimes "expected," that 501(c)(3) employees draw a salary.

44.    Specifically, during the February 1, 2017 podcast that accuses Plaintiff 100+ Abandoned Dogs of committing a "scam," Defendant Butkus' CPA guest speaker advises Defendant Butkus that, for practical reasons, 100% of contributions to 501(c)(3) charities do not directly go to the charitable cause unless everyone is a volunteer, "which is hard to maintain."    Accordingly, Defendant Butkus' own account-guest advised Defendant Butkus that with 501(c)(3) organizations, it can be "***expected***" that a certain percentage of charitable donations are devoted to "administrative management expenses." Likewise, Defendant's own accountant-guest advised Defendant Butkus that with regard to charitable donations, there are also fundraising expenses that "can be acceptable."

45.    As such, the information in Defendant Butkus' "Inspector Bark" February 1, 2017, podcast evidences that Defendant Butkus had all the information Defendant Butkus required to know the difference between inadvertent non-compliance with many technical rules and regulations and actual dishonesty rising to the level of a "scam." Nevertheless, after being informed as such, Defendant Butkus nevertheless repeatedly

and maliciously defamed Plaintiff 100+ Abandoned Dogs and its president Amy Roman with "100+ ways to scam."

46.     In this vein, on her January 17, 2017, Dog Rescues- the Good- the Bad- and the Ugly of South Florida Facebook page, writes, in part, "Here we have shamy Amy [Roman] with her fake smile!...try and keep it classy girls! Orange is the new black!" Defendant Butkus' foregoing statement is clearly defamatory and malicious as Plaintiff 100+ Abandoned Dogs' former counsel has informed Defendant previously that commenting Amy Roman is going to "look good in orange", or making like comments is clearly designed to create the false and defamatory implication that Amy Roman has committed, has been charged with, or is under suspicion for committing a crime related to the operation of Plaintiff 100+ Abandoned Dogs' charitable functions.

47.     On June 9, 2017, 100+ Abandoned Dogs by and through its attorney sent a Cease and Desist Letter (hereinafter the "Cease and Desist Letter") to Defendant Butkus demanding that Defendant Butkus  remove any Internet posts and any other media, which Defendant Butkus has posted, authored, or to which Defendant Butkus has contributed, either directly, or indirectly, and either eponymously or anonymously, that state or imply that 100+ Abandoned Dogs and Amy Roman are guilty of dishonesty, and cease and desist from making and further such statements on the internet and through any other media.  The Cease and Desist Letter is attached hereto as **Exhibit "A."**

48.     Remarkably, the Cease and Desist Letter, over the course of 15 pages, thoroughly explains, among other things, the law of defamation and how material omissions of fact can make it so that a message can have a defamatory effect that may give rise to a cause of action for defamation against the party who omits facts and thereby

publishes misleading and defamatory statements. The letter likewise explains to Defendant Butkus, among other things, how and why Defendant Butkus' statements concerning the Florida Department of Agriculture and Consumer Services' case regarding Plaintiff 100+ Abandoned Dogs is defamatory and misleading.

49.     As such, Defendant Butkus has thoroughly been made aware that this defamatory smear fits squarely within criteria for Florida's defamation by implication cause of action.

50.     Notwithstanding that Defendant Butkus has been advised multiple times regarding the defamatory effects of her continually false implications, statements and half-truths regarding Plaintiff 100+ Abandoned Dogs, Defendant Butkus has clearly demonstrated that notwithstanding that she knows her actions are defamatory she continues to make defamatory statements and implications against 100+ Abandoned Dogs intentionally, maliciously, and with a wanton disregard for the falsity and defamatory effect of such statements and implications.

51.     After receiving the extensive Cease and Desist Letter on June 9, 2017, Darcy Butkus continued to make false and misleading statements regarding the matter between Florida Department of Agriculture and Consumer Services and Plaintiff 100+ Abandoned Dogs:

a.  On July 16, 2017, knowing that Amy Roman spent money on herself out of her own personal account from proceeds derived from her modest personal income that the Settlement Agreement did not fine 100+ Abandoned Dogs for stealing or misappropriating money from the dog rescue, Defendant Butkus misleadingly, dishonestly, and maliciously defames Plaintiff 100+ Abandoned

Dogs as misappropriating donation money for Amy Roman's personal use and

pleasure by writing in pertinent part:

WACKED with a $5000 FINE! HOLY MOLY! 100+ Abandoned Dogs of the Everglades, Florida was fined by the STATE of FLORIDA with a $5000 fine in May of this year. Ask yourself this. Do you really want to donate to a so called organization that was fined by the Dept. of Agriculture who oversees 501c3's? . . . Are you okay with the Founder going to get her nails and toes done on a regular basis, ***all on the dog's dime***? . . .

[Emphasis added.]

b.  On July 23, 2017, on Facebook, Defendant Butkus falsely implies and/or

states that per the Settlement Agreement with the Florida Department of

Agriculture and Consumer Services, 100+ Abandoned Dogs was "fined" for

misappropriating and/or stealing money and – very ironically – exclaims,

"Truth certainly does win!" Specifically, knowing that Amy Roman spent

money out of her own personal account from proceeds derived from her salary

and own personal income and that the Settlement Agreement did not fine

100+ Abandoned Dogs for stealing or misappropriating money Defendant

Butkus makes clear that she intends to continue to "roll" with defaming

Plaintiff 100+ Abandoned Dogs and misleadingly, dishonestly, and

maliciously writes in pertinent part:

What about $1000 mattress that they used donation money for? What about the numerous manicures and pedicures that the Investigator found? What about the Pilates that ***the donation money was spent on***? . . . We will continue to bring awareness to the Public. That is how we roll. Truth certainly does win! In the amount of $5000.00.

[Emphasis added.]

20

## COUNT I
## DEFAMATION BY DARCY ODE BUTKUS

Plaintiff incorporates by reference all preceding paragraphs, restating the information contained therein, and further alleges as follows:

52.     Defendant's statements were designed to, and did, destroy Plaintiff 100+ Abandoned Dogs' professional reputation and severely limited the Plaintiff's ability to carry out its charitable function.

53.     Defendant Butkus' false and defamatory accusations have been, and are continuing to be, widely disseminated in blogs, podcasts, and otherwise published and posted on various websites on the internet, causing Plaintiff not only past and current harm, but perpetual harm.

54.     At the time of said publications, Defendant Butkus either knew that the statements were false, or acted in reckless disregard of their truth or falsity.

55.     The false and unprivileged statements about Plaintiff 100+ Abandoned Dogs by Defendant Butkus exposed Plaintiff 100+ Abandoned Dogs to distrust, hatred, contempt, and ridicule, and caused Plaintiff to be avoided and disavowed by its supporters, sponsors, and thereby irreparably injured Plaintiff 100+ Abandoned Dogs' reputation and capacity to save abandoned animals that will otherwise suffer and die.

56. At the time of said publications, Defendant Butkus defamed Plaintiff 100+ Abandoned Dogs for her own personal gain, and did so in bad faith and with ill will and malice.

57.     The said false and defamatory statements were published to third parties, and were then also widely disseminated to the public at large through newspaper articles, television news broadcasts, and the internet, as more particularly described above.

58.    The intentional and wrongful conduct of the Defendants proximately caused the following damages to Plaintiff 100+ Abandoned Dogs:

a.  Severe and irreparable damage to Plaintiff's professional reputation, including the capacity to raise donations and procure volunteer service.

b.  Damage to the Plaintiff's ability to conduct its charitable mission to save abandoned, suffering, and dying animals and to educate the public about the plight of these animals.

**WHEREFORE,** Plaintiff, having fully stated his cause of action against the Defendant now prays for judgment against the Defendants as follows:

a.     For judgment against the Defendants, jointly and severally, in the cause as described herein;

b.     For special damages in an amount to be proved at time of trial;

c.     For general damages in an amount to be proved at time of trial;

d.     For injunctive relief prohibiting Defendant Butkus from continuing to engage in further defamatory speech and acts.

e.     For such other and further relief as the Court deems just and equitable.

## COUNT II
## DEFAMATION BY IMPLICATION

Plaintiff incorporates by reference paragraphs 1-57, restating the information contained therein, and further alleges as follows:

59.    Defendant Butkus maliciously, recklessly, in bad faith and in wanton disregard for the truth or falsity of the implications of Defendant Butkus' speech

regarding Plaintiff 100+ Abandoned Dogs juxtaposed a series of facts so as to imply a defamatory connection between them.

60.     Defendant Butkus maliciously, recklessly, in bad faith and in wanton disregard for the truth or falsity of the implications of Defendant Butkus' speech regarding Plaintiff 100+ Abandoned Dogs created defamatory implications concerning Plaintiff 100+ Abandoned Dogs by omitting facts regarding Plaintiff 100+ Abandoned Dogs, or the matter related to 100+ Abandoned Dogs.

61.     The defamation by implication of Plaintiff 100+ Abandoned Dogs by Defendant Butkus proximately caused Plaintiff 100+ Abandoned Dogs irreparable damage to its reputation, damaged Plaintiff's ability to procure funds to advance its charitable cause of saving abandoned and dying animals, and damaged Plaintiff's ability to recruit volunteer service to advance its charitable cause of saving abandoned and dying animals.

62.     The Plaintiff's damages are ongoing and continuous and will continue indefinitely into the future.

**WHEREFORE,** Plaintiff, having fully stated his cause of action against the Defendant now prays for judgment against the Defendants as follows:

a.     For judgment against the Defendants, jointly and severally, in the cause as described herein;

b.     For special damages in an amount to be proved at time of trial;

c.     For general damages in an amount to be proved at time of trial;

d.     For injunctive relief prohibiting Defendant Butkus from continuing to engage in further defamatory speech and acts.

      e.      For such other and further relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiff respectfully demands a jury trial on all issues so triable.

      DATED this 27th day of September, 2017.


      Respectfully submitted,

      **Kaiser Romanello, P.A.**


By: /s/   *Lorne Adam Kaiser*_____
      Lorne Adam Kaiser
      *Kaiser Romanello, P.A.*
      11555 Heron Bay Boulevard, Suite 200
      Parkland, Florida 33076
      Telephone: 954.603.0100
      Facsimile: 954.827.0472
      Email: lkaiser@kaiserromanello.com
      Florida Bar No.: 0568491

Exhibit "A"

# KAISER|ROMANELLO

## ATTORNEYS AT LAW

11555 HERON BAY BOULEVARD, SUITE 200
PARKLAND, FLORIDA 33076
TELEPHONE: 954.603.0100
FAX: 954.827.0472

_____

09 June 2017

Darcy Butkus
5890 Cedar Ridge Trail
Cumming, Georgia 30028
Sent via email to darcysdogduties@aol.com and UPS

**Re:**        **Our Clients:  100+ Abandoned Dogs of Everglades Florida and Amy Roman**
               <u>Notice of Defamation Action and Demand to Cease and Desist</u>

Ms. Butkus:

This law firm represents 100+ Abandoned Dogs of Everglades Florida ("100+ Abandoned Dogs") and Mrs. Amy Roman.  **If you are represented by an attorney, please direct this correspondence to your counsel immediately**.

This letter is written to demand that you stop slandering and libeling 100+ Abandoned Dogs and Amy Roman. We know, however, that you have attacked multiple other charities that save animals. We know that you have received a number of letters from various law firms demanding that you stop slandering and libeling their clients. We know that you ignore these letters.  We know that you may not heed correspondence as you have been "Baker Acted" and have, on at least one occasion, told the police that you are "G_d" and that G_d wants you to "do things that would change the world."

So, why are you receiving this long and detailed letter? First, under Florida law, this letter is a prerequisite to filing a defamation action against you. Second, while the primary goal of this letter is to make you stop defaming and stalking 100+ Abandoned Dogs, Mrs. Roman, and Mrs. Roman's family, the realistic and secondary goal of this letter is to make it very clear to a judge and jury that you know the truth about 100+ Abandoned Dogs and Amy Roman but continue to defame 100+ Abandoned Dogs and Amy Roman with reckless disregard for the truth and with actionable malice. As such, this letter will likewise make clear that your defamation and stalking of 100+ Abandoned Dogs and Mrs. Roman are motivated by a malevolent desire to harm and destroy the dog rescue and Mrs. Roman personally; or, as you colorfully put it, to "bring down the Roman Empire…brick by brick."

<u>**I.**</u>        <u>**The Law of Defamation and Defamation By Implication**</u>

Repeatedly, you cherry-pick facts, take them out of context, and create a misleading and defamatory impression of both 100+ Abandoned Dogs and Mrs. Roman. This constitutes defamation by implication, which is actionable in Florida. As the Florida Supreme Court explains, "defamation by implication arises, not from what is stated, but from what is implied when a defendant (1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by ***OMITTING*** facts, such that [the publisher of the statements] may be held responsible for the defamatory implication." *Jews for Jesus*, *Inc. v. Rapp*, 997 So. 2d 1098, 1108 (Fla. 2008) [Emphasis added.]

Thus, it is not availing to argue that a particular statement may be literally true if you have repeatedly taken the facts contained therein out of context to make the them seem more derogatory than they really are so as to create a false, misleading, and defamatory impression of the target of your criticism.  Simply put, in the eyes of the law – a half-truth is a lie and constitutes ***actionable defamation***.

While hatred of a person, or organization is in and of itself not actionable as malice, hatred is compelling evidence of motive for defamation of an organization and person by implication in reckless disregard for the falsity of those implications. Rarely, one sees an expressly malicious person in a defamation action. But, you appear to be uniquely malicious: you have repeatedly admitted in public that you "detest" 100+ Abandoned Dogs and make it clear that it is your mission is to destroy the dog rescue and Amy Roman personally:

- On January 13, 2017, on your "Dog Rescues –The Good-The Bad-And The Ugly South Florida" Facebook page, you gloat, "The Roman Empire is starting to fall, brink (sic) by brink (sic)! Take a look!"

- On January 15, 2017, on your Facebook post you write, "Time to take down the 'Roman' Empire." (This is apparently a mission statement that you obsessively repeat to anyone with whom you discuss 100+ Abandoned Dogs and Amy Roman.)

- On or about February 1, 2017, on your Blog Talk Radio "Inspector Bark" show, you – once again – state, "the Roman Empire is Starting to Fall."

Due to the extensive width and breath of your obsessive stalking of and defamatory campaign against 100+ Abandoned Dogs and Amy Roman and due to the numerous false, or anonymous identities under which you have waged this campaign, we cannot locate every instance of your defamatory actions. But, we do not have to. We need only advise you of the defamatory nature of your actions as well as circumstances reasonably permit so as to put you on actual, constructive, and inquiry notice of the defamatory nature of your statements and actions undertaken by you either directly, or anonymously.

a.   **Blog Talk Radio, Inspector Bark, "100+ ways to scam! And NOT get away with it! 18 months it took!"** *Circa* **February 1, 2017**

In the title of your "radio show," you attribute 100+ Abandoned Dogs and Amy Roman with a "scam." "Scam" has a particular meaning that attributes a person and organization with a dishonest and loathsome character that goes way beyond alleged incompetence. Merriam-Webster defines "scam" as a fraudulent act. Remarkably, the information in your "Inspector Bark" show evidences that you have all the information you needed to know the difference between inadvertent non-compliance with technical rules and regulations and actual dishonesty rising to the level of a "scam," which you repeatedly attribute to 100+ Abandoned Dogs and Amy Roman. Yet – in reckless and wanton disregard for the truth - and in furtherance of your mission to "bring down the Roman Empire" - you attribute a "scam" to the dog rescue and Amy Roman.

i.   **Sasha Velez, Senior Financial Investigator of Regulatory Investigation, Office of Regulatory Investigation Section, Office of Agricultural Law Enforcement, Florida Department of Agriculture and Consumer Services.**

Upon introducing Ms. Velez, you officiously pronounce that Ms. Velez is a "Senior Fraud Investigator of Regulatory Investigation Section, Office of Agricultural Law Enforcement." You also underscore that Ms. Velez is a "CFE" (Certified Fraud Examiner), a "CPM" (Certified Public Manager), and CSM (Certified Supervisory Manager.) As such, you state to Ms. Velez, "your credentials are terrific"! Clearly, you were impressed with Ms. Velez' credentials. Then, you essentially ignored nearly everything Ms. Valez had to say.

You well-know that before the recent investigation, ***neither 100+ Abandoned Dogs, nor Amy Roman had any history of alleged improprieties regarding alleged misappropriation of donations to the dog rescue.*** As you have bragged about inducing and following the State's investigation, you also know that because 100+ Abandoned Dogs was a new organization and Amy Roman had no prior experience directing a dog rescue, the dog rescue was somewhat disorganized in the first few years of operation, but has since taken broad measures to conform to statutory and regulatory requirements. Likewise, it is remarkable, that ***there is no allegation, charge, or finding in the State's 170 page report that you continuously brag about having read that allege fraud, a "scam," or any intentional dishonestly whatsoever***. In that context, this exchange between Ms. Valez and you and/or your guest and/or co-host is remarkable:

Ms. Velez:          Our purpose obviously is to make sure that businesses or organizations are compliant with the state statute . . . There's ***so many quirks and so many little things*** you have to look for and ***we do have to educate the public***…***a lot of people don't understand*** that there are some things you can and cant do. You just have to be ***careful*** on how you do it . . .

3

| | |
|---|---|
| Ms. Velez: | …And I'm not saying something is wrong, just because you report it doesn't mean that somebody is defiantly doing something wrong |
| "Inspector Bark": | Sure. Sure. |
| Ms. Velez: | But at least it gives us a heads up we can at least take a look. If nothing comes of it nothing comes of it. But at least we get a chance to look at it and figure it out one-way or another. |
| "Inspector Bark": | Sure, ***and it might be they did something incorrect, something they wont be doing again once they get notified***. |
| Ms. Velez: | Exactly. |

## ii.     Tax Accountant, CPA, and Audit Supervision Tempelton and Associates, West Palm Beach

After Ms. Valez, you had an accountant reportedly experienced with 501(c)(3) organizations appear on your podcast. As such, based on that appearance, you are aware of several things. First, you are aware that, as a general principle, taking a salary as an officer of a 501(c)(3) is not necessarily improper, or illegal, or a "scam." Likewise, based on your account-guest's statements, you are aware that often 100% of contributions to 501(c)(3) charities do not directly go to the charitable cause unless everyone is a volunteer, "which is hard to maintain." Accordingly, your own account-guest advised you that with 501(c)(3) organizations, it is ***expected*** that a certain percentage of charitable donations are devoted to "administrative management expenses." Likewise, your accountant-guest advised you that with regard to charitable donations, there are also fund raising expenses that "can be acceptable."

Remarkably, in the same "podcast" wherein you were provided with the foregoing information, you attribute 100+ Abandoned Dogs' with $750,000.00 of charitable donation revenue per year, and – in the same proverbial breath – take issue with Amy Roman drawing a $21,333.00 salary for 2014 and a $39,433.00 salary for 2015 respectively. Based on the revenues you have attributed to 100+ Abandoned Dogs, those salaries – which are the only income Mrs. Roman has and without which she could not continue to operate this successful dog rescue – represent approximately 2.8% and 5.25% of the dog rescue's charitable revenue for 2014 and 2015 respectively. Even when you add in a $10,000.00 bonus towards a used BMW, which you likewise take issue with, Mrs. Roman's compensation represents a mere approximate 4.1% and 6.5% of the charitable donations that you have attributed to 100+ Abandoned Dogs for 2014 and 2015 respectively.

Based upon the $21,333.00 salary you have attributed to Amy Roman for 2014, Mrs. Roman's salary WAS BELOW the "living wage" for a single adult living in Broward County, Florida, according to Massachusetts Institute of Technology Living Wage Calculator.   Amy

Roman's workweek far exceeds 40 hours per week. Nevertheless, attributing 40 hours of work per week to Mrs. Roman, based on a $21,333.00 salary you have attributed to Mrs. Roman, Mrs. Roman's hourly wage would average $10.25 per hour, a full $1.43 per hour BELOW THE LIVING WAGE FOR A SINGLE ADULT LIVING IN BROWARD COUNTY FLORIDA, ACCORDING TO THE MIT LIVING WAGE CALCULATOR. Even if you considered Mrs. Roman's $10,000.00 bonus toward the purchases of her used BMW and prorated same over 2014 and 2015, Mrs. Roman's hourly wage for 2014 would be approximately a mere $12.66 per hour, less than $1.00 per hour above the living wage, according to MIT.  The fact is, however, Mrs. Roman works far more than 40 hours a week and made far less than $12.66 per hour as misery and sickness for these rescued animals do not take nights and weekends off and neither does Mrs. Roman.

In considering the reasonableness of 100+ Abandoned Dogs' administrative expenses, it is instructive to consider the administrative and fund raising expenses of other large and reputable animal rescue charities compared with 100+ Abandoned Dogs' administrative expenses. For example:

- According to People for the Ethical Treatment of Animals (PETA) Form 990 2015 tax return, PETA paid out NINE MILLION EIGHT HUNDRED FORTY SEVEN THOUSAND THREE HUNDRED NINTY-SIX DOLLARS ($9,847,396.00) in "salaries, other compensation, and employee benefits."

- According to the American Kennel Club Canine Health Foundation ("the American Kennel Club") Form 990 2015 tax return the American Kennel Club paid out SEVEN HUNDRED FIVE THOUSAND ONE HUNDRED FORTY-SEVEN DOLLARS ($705,147.00) in "salaries, other compensation, and employee benefits."

- According to the Humane Society of the Untied States' ("the Humane Society") Form 990 2015 tax return, the Human Society paid out FIFTY-TWO MILLION FIVE HUNDRED THIRTY TWO THOUSAND EIGHT HUNDRED SEVEN DOLLARS ($52,532,807.00) in "salaries, other compensation, and employee benefits."

While you may not care for 100+ Abandoned Dogs, or you may prefer other dog rescues, that does not give you license to state, or imply, that 100+ Abandoned Dogs, or Amy Roman committed a "scam" or a fraud. Any further, or continued action by you to do so will result in 100+ Abandoned Dogs and Amy Roman seeking an injunction against you as well as a damages award exceeding many hundreds of thousands, if not millions of dollars against you personally. As such, you are aware that 100+ Abandoned Dogs receives approximately $750,000.00 per year in donations. Should you succeed to "bring down the Roman Empire," as you say, you will be responsible to compensate 100+ Abandoned Dogs for years of lost $750,000.00 donations.

5

**B.      Miscellaneous Defamation on Facebook**

**1.      The Sarah Martin Matter**

On your Dog Rescues The Good-The Bad- And The Ugly Facebook Page, you write, "they threw her under the bus and sided with the 5 feral dogs!  Nice way to back up a volunteer that traveled several hours to go get little Taco, only to be told she is dead to them if she tells what really happened."  Here, you are referring to the Sarah Martin matter. Obviously, 100+ Abandoned Dogs, like any dog rescue, heavily relies upon the help of volunteers. As such, any attempt by you to falsely imply, or suggest that 100+ Abandoned Dogs mistreats its volunteers or throws them "under the bus" is extremely damaging to the dog rescue, highly defamatory, and actionable. As such, with regard to Sarah Martin, you are hereby put on actual, inquiry, and constructive notice of what *really* happened:

a.  It is quite ironic that you – as a self-professed animal advocate - so easily condemn dogs as "feral" and support their being put to death where, as here, the dogs were guilty of nothing more than defending their property from a stranger as nature commands them to do. Notwithstanding that you repeatedly state that Ms. Martin was "attacked" by five "feral" dogs, eyewitness Jennifer Alexander far more humanly and more wisely stated, "I do not think these dogs are aggressive. I think the dogs were being protective of the son [Buddy Lowe] and the property they live on, as most dogs would be in that situation."

b.      These dogs were not roaming free in the streets. They were home. They were behind a chained-closed barbed wire fence adorning a "Beware of Dog" sign.  Unlike Ms. Martin who had the benefit of – among many other warnings – a "Beware of Dog" sign – these are truly "voiceless creatures" as you say – as they cannot state in their defense that there were no "Good Human" signs for the dog's benefit as they saw Ms. Martin trespass into their yard. Ms. Martin was extremely reckless and irresponsible. The very purpose of her trip to the Tampa, Florida property where Taco resided was to take Taco from the property as otherwise the then owners feared that Taco would be bitten by the larger dogs. As such, Ms. Martin – who worked in a veterinarian's office and is a self-professed "pit-bull mama"  - knew that she had to use caution when approaching the property.

c.      On the property where Ms. Martin was bitten, there were multiple indications of danger that would have put a reasonable person on notice not to enter. First, there was a "Beware of Dog" sign. There was a barbed wire fence. There was a chain around the entrance of the barbed wire fence wrapped around multiple times. There were barking and growling dogs. There was an owner waving her off (even though Ms. Martin claims she was being waved in, which makes no sense on multiple levels.)  There was co-volunteer Jenifer Alexander, who pleaded for and warned Ms. Martin not to enter the property. Any reasonable

6

person would know not to enter the property, as doing so would obviously put both Ms. Martin and the dogs at risk.

d. Ironically, it was because of Ms. Martin's foolish actions that "poor Taco" died. Apparently, in the mayhem Ms. Martin caused, Taco suffered a heart attack, or was killed by another, larger dog, which the mission was expressly intended to prevent. Moreover, it is a tragic irony that, Ms. Martin, as a "dog rescue volunteer," undertook to rescue Taco and instead caused Taco to die in the mayhem and – five additional dogs that were guilty of nothing more than defending their property against an oblivious trespasser - to be darted, taken from their home, and condemned to die.  But for the heroic actions of the dog rescue after this debacle, all of the dogs would have been euthanized as a direct consequence of Ms. Martin's actions. Ultimately, the dogs were placed in loving homes.

e.       100+ Abandoned Dogs volunteer Jennifer Alexander stayed with Ms. Martin at the hospital for 21 hours. Ms. Alexander only left Ms. Martin's side when Ms. Martin's mother reportedly told Ms. Alexander to go home because she, Ms. Martin's mother, had her friend coming.  As such, Ms. Alexander indicated that "I stayed with her for as long as I could." But, apparently because 100+ Abandoned Dogs volunteer Alexander's 21-hour vigil by Ms. Martin's bedside is highly inconvenient to "threw Sarah under the bus" canard, you omit any reference to Ms. Alexander's actions as a 100+ Abandoned Dogs representative when you make statements concerning this matter.  As such, you are likewise advised:

• 100+ Abandoned Dogs expressed that they "wish Ms. Martin well and look forward to her speedy convalescence." Yet, apparently because this is not convenient to your "threw Sarah under the bus" canard, you omitted this sentiment from your public statements.

• Amy Roman of 100+ Abandoned Dogs had multiple conversations with Ms. Martin after the incident wherein Mrs. Roman continually expressed her support for Ms. Martin and sympathy for Ms. Martin's misfortune. Nevertheless, Mrs. Roman's concern for both Ms. Martin and the dogs are not mutually exclusive. As such, in the aftermath of this unfortunate event, Mrs. Roman was glad that Ms. Martin was in good hands as doctors were caring for Ms. Martin's leg bites.

• Amy Roman only discontinued contact with Ms. Martin after Ms. Martin's uncle reportedly demanded that Mrs. Roman and 100+ Dogs cease communications with Ms. Martin and Ms. Martin publicly attacked 100+ Abandoned Dogs on television and other media.

Stating that 100+ Abandoned dogs "threw" Ms. Martin under the bus without stating the forgoing facts clearly creates a false and defamatory implication that 100+ Abandoned Dogs mistreats and does not support the very volunteers upon which its existence and mission rely. Now that you are on notice of the foregoing facts, you cannot with impunity mention this incident without fully representing all the facts as you do so at your legal peril.

2.      **Cactus Car Wash; Bed, Bath, and Beyond; Target; etc.**

On your Dog Rescues-The Good-The Bad-And The Ugly Facebook page you list 100+ Abandoned Dogs circa 2012 itemized bank records along with defamatory commentary concerning same. As previously pointed out, many of the bookkeeping and financial concerns related to the dog rescue stem from the earliest years of its operation and have since been remedied. That said, you have underscored various expenses to suggest that 100+ Abandoned Dogs is misusing funds that are not related to it charitable purpose. That is not the case. For example, the numerous Cactus Car wash charges are not emblematic of a dog rescue misusing its funds. It is exactly the opposite: they represent saved lives.  If you have ever personally rescued an abandoned animal who has languished in swamp-like conditions and placed that animal in your car, you would know that your car would have ticks, fleas, dirt, blood, and all manner of stink and filth that resides in a swamp. You would know that you would need a car wash – every single time. If you viewed the video footage the rescue provided to the State of Florida you would see ticks the size of grapes crawling up and around the seats of Mrs. Roman's supposed "fancy" bought-used BMW.  Now you do know.

As your accountant podcast guest advised you, fund-raising expenses are acceptable. In fact, to optimize the donations to the rescue, they are often vital. As such charges to stores such as Bed, Bath, and Beyond represent purchases for gift baskets and the like that the rescue gives away or auctions at events to encourage donations. With regard to Target and like stores, the organization often buys dog toys, blankets, and the like from these retailers. And, although you may feel that you can do it better and that the rescue may get "a better deal" on towels by getting them for free from hotels, that still does not give you license to publicly accuse the rescue and Amy Roman of a "scam."

3.      **"Amy is going to look good in orange"**

On January 17, 2017, on your Dog Rescues- the Good- the Bad- and the Ugly of South Florida Facebook page, you write in part "Here we have shamy Amy with her fake smile!...try and keep it classy girls! Orange is the new black!"  Likewise, on your social media, you have quipped that Amy Roman would "look good in orange." As Mrs. Roman's previous attorney informed you, quipping that Mrs. Roman is going to "look good in orange", or like comments, is clearly designed to create the false and defamatory implication that Mrs. Roman has committed, or has been charged with a crime. This ugly smear fits squarely within criteria for Florida's defamation by implication cause of action, which subjects you to being sued for juxtaposing your complaints about Mrs. Roman with comments regarding how Mrs. Roman will "look good in orange" to create the false implication that Mrs. Roman has committed a "scam" or is guilty of a crime.

8

### 4.     Taking Donations for Taco, a Dog "They Never Laid Hands On."

On your DogRescuethegoodthebadandtheugly Facebook page, you state, "A dog named Taco, that they never laid hands on, but kept a donation button up for 3 in a half months. There is a lot more, but exhibit 18, was one key piece of evidence." If you read 100+ Abandoned Dogs' response to the State, or if you actually visited the dog rescue's site where the rescue was allegedly maintained this "donation button" for Taco, you would know that the subject page, like many webpages, is bifurcated: the left side of the page, where the "donation button" resides, is fixed and does not move. The right side of the page, however, scrolls up and down so that one can page down to read previous posts. As such, you know, or should know, that you, or one of your malicious cohorts paged down on the right side until an old post about Taco appeared parallel with the fixed "donate" button on the left side of the screen and took a screen shot of same to make it appear as if the organization was asking for donations for the small, deceased Chihuahua. This is particularly obnoxious and egregious defamation and defamation by implication as you well-know that the reason the that 100+ Abandoned Dogs "never laid hands on" Taco is because of the negligent and reckless actions of Sarah Martin, which, as discussed above, you likewise willfully and maliciously fail to report.

## IV.     Your Previous "Defenses" and Counterclaims Are Illegitimate and Will Not Offer a Defense Against A Defamation Suit Brought By 100+ Abandoned Dogs and Amy Roman

In the Diana Peter's matter, in which you ultimately agreed by a final order to cease and desist "authoring or encouraging any emails, correspondence, posting Facebook entries, or comment in any form concerning [Diana Peters] and to do all within [your] authorities to delete "Dog Rescues Bad and the Ugly of So. Florida," you cite a number of "defenses," or counter-claims. They are ineffectual and improper.

In "Allegation I" in the Diana Peters matter, you claim that Ms. Peters failed to comply with Florida Statute 770.01 such that you allege Ms. Peters' cease and desist letter was "vague and ambiguous, and did not meet the requirements of FL SS 770.01."  Obviously, this letter which is quite detailed, in not vague or ambiguous. It identifies the offending statements. It tells you why they are defamatory.

In "Allegation II" of the Diana Peters matter you raise the "Substantial Truth Doctrine." In allegation two, you cite *Smith v. Cuban American Nation Foundation*, 731 So.2d. 702, 706 (Fla. 3d DCA 1999) for the proposition that "[u]nder the substantial truth doctrine a statement does not have to be perfectly accurate if the 'gist' or the 'sting' of the statement is true." Be advised that, under Florida's Defamation by Implication doctrine the converse is also true as

noted by the Florida Supreme Court in *Jews for Jesus*, *Inc. v. Rapp*, 997 So. 2d 1098, 1108 (Fla. 2008):

> The legal significance of the "gist" of a publication was noted in W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 116, at 117 (5th ed. Supp.1988), which stated that while defamation law shields publishers from liability for minor factual inaccuracies, "**it also works in reverse, to impose liability upon the defendant who has the details right but the `gist' wrong." Simply put, "if the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or <u>creates a defamatory implication by *omitting* facts</u>, he may be held responsible for the defamatory implication, unless it qualifies as an opinion, even though the particular facts are correct**." Id. (footnotes omitted).

As documented herein, you have continually created a false and defamatory impression by omitting material facts that are exculpatory for 100+ Abandoned Dogs and Amy Roman. Consequently, although you may claim that some of your "facts" are technically correct, you are well-aware that the ***gist*** of your posts and comments unquestionably create a false and misleading impression and are defamatory.

In "Allegation III," in the Diana Peters matter, you claim that Ms. Peters failed to plead with enough particularity to plead for punitive damages. Rest assured, that if and when 100+ Abandoned Dogs and Amy Roman sue you, punitive damages will be supported with detailed ultimate facts to support the claim.

In "Allegation IV," of the Diana Peters matter, you defend that to the extent that you are being sued by a corporate entity the action "should be addressed and represented by only by (sic) legal counsel." 100+ Abandoned Dogs and Amy Roman will sue you through a law firm.

In "Allegation V" in the Diana Peters matter, you make a convoluted and off-point argument that somehow Ms. Peters has forfeited her right to obtain damages against you because of the "Streisand Effect" whereby Ms. Peters "doubled downed, triple downed, and quadrupled downed" on your defamation so as to place her rescue and herself "beyond reputational redemption." You also state in the same convoluted allegation that "internet disputes often produce exaggeration and fiery rhetoric" that readers are likely to interpret as "mere insults or opinions." You cite California law for this proposition. Notwithstanding that you don't understand California law, California law is inapposite in Florida. That said, your arguments are incoherent: you say in one breath that words on the Internet are mere "fiery rhetoric," yet in the next proverbial breath, you admit that their republication can place a person or a rescue "beyond reputational redemption." That admission in the public record will go very far in supporting a massive damages award against you.

10

In "Allegation VI" in the Diana Peters matter, you claim the "Rhetorical Hyperbole Doctrine" protects your comments. First, the fact that you admit to engaging in "rhetorical hyperbole" is remarkable. Nevertheless, it is nonsensical and legally deficient.  First, it is clear from the written response to your blogs and from the recorded comments of the listeners of your podcast that your actions have had a defamatory effect upon them and that they do not take your comments as "rhetoric" or "hyperbole." That said, where, as here, the speaker or writer neglects to provide the audience with an ***adequate factual foundation*** prior to engaging in the offending discourse, liability may arise. *See Madsen v. Buie*, 454 So.2d 727 (Fla. 1st DCA 1984); *Eastern Airlines v. Gellert*, 438 So.2d 923 (Fla. 3d DCA 1983); *Smith v. Taylor County Publishing Co.*, 443 So.2d 1042 (Fla. 1st DCA 1983). Here, to create a false defamatory impression, you have systematically omitted facts that would otherwise, if provided, give your readers and listeners enough information to determine that you were engaging in so called "rhetorical hyperbole." Accordingly, when 100+ Abandoned Dogs sues you the "Rhetorical Hyperbole Doctrine" will not protect you.

In "Allegation VII" of the Diana Peters matter, you defend that your statements are merely "a collection of opinion, gags, jokes, and hyperbolic statements." Having substantially addressed the ineffectual "hyperbolic" argument, I turn to the "opinion" defense. The law is very clear: "defamation can arise where a statement of opinion <u>reasonably implies</u> false and defamatory facts."    *Jesus*, *Inc. v. Rapp*, 997 So. 2d 1098 (Fla. 2008), citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 13, 20 (1990).  Here, one does not need to conjecture about what your statements have implied as you exclaim that the "Fall of the Roman Empire" is imminent. Likewise, when you fail to provide an ***adequate factual foundation*** to give your readers and listeners enough information to know that it is allegedly "just a joke," or the like, you are committing actionable defamation.

In "Allegation VIII" in the Diana Peters matter, you reference "other parties" over whom you have "no control" Under Florida law, you are responsible for not only your original publication, but any republication that of your defamatory comments by third-parties that foreseeably results from the original publication. In Florida, the original publisher of defamatory statements has been found legally responsible for the multiplication of the false and defamatory information by third-parties. *Musto v. Bell South Telecommunications Corp.*, 748 So.2d 296, 297 (Fla. 4th DCA 1999). Notwithstanding the foregoing, you have made numerous defamatory statements resulting in potentially hundreds of thousands, if not, millions of dollars in damages to 100+ Abandoned Dogs and Amy Roman that have nothing to do with the republication by third-parties and are directly attributable to your own original statements.

In "Allegation IX" in the Diana Peters matter, you acknowledge that statements of opinion . . . are protected under the First Amendment when they do not imply False Statements of Fact." As such, inverting your argument, you admit that when you do imply false statements of fact you may be legally responsible even if your statements are couched in "opinion." Indeed, you are guilty of setting forth many statements – whether they are claimed opinion or not – that are actionable precisely because they imply false statements of fact. With regard to Section 230

11

of the Communications Decency Act, applies to publishers who are mere intermediaries of the offending speech. If, however, the defamation issues directly from the publisher, or even if the defamatory language is substantially edited by the publisher, Section 230 of the Communications Decency Act does not protect the publisher. Here, the offending defamation comes directly from you and is edited by you. Therefore, Section 230 is irrelevant and does not protect you.

In "Allegation X" in the Diana Peters matter, you substantially state that Ms. Peters has a history of ignoring common laws and that "ignorance is not a defense under the law, when conduct is repetitive . . . [when an organization' . . . is notified of negligence of the same infractions." First, as I stated above, there is no prior history of 100+ Abandoned Dogs or Amy Roman committing "the same infractions" after being notified. As such, you have no moral or legal justification to accuse a person and an organization of a "scam," and implicating Mrs. Roman and 100+ Abandoned Dogs with fraud based upon actions that betray nothing more than ignorance of the law even if ignorance of the law is no excuse to avoid legal fines or sanctions based upon inadvertent non-compliance. You well-know that there is no instance of Mrs. Roman and 100+ Abandoned Dogs being "notified of negligence of the _**same**_ infractions" at earlier dates. That said, "Allegation X" you raised in the Diana Peters matter as well as your "Inspector Bark" podcast shows that you know there is a material difference between "a scam" and negligent inadvertence stemming from inexperience in the first years of the organization's existence.  As such, your allegations and implications of dishonesty raised against Amy Roman and 100+ Abandoned Dogs is clearly willful, malicious and defamatory.

In "Allegation XI" in the Diana Peters matter, an action, which ultimately resulted in you agreeing to pay Ms. Peters damages and cease and desist making disparaging remarks about Ms. Peters and her organization, you stated "Diana Peters made illegal, improper, or perverted use of the legal system by filing the underlying lawsuit."  This is a ham-handed attempt to make a malicious prosecution allegation. The foregoing information clearly shows that a lawsuit against you by 100+ Abandoned Dogs and Amy Roman is clearly justified and does not in the slightest approach a "perverted use of the legal system." In fact, the very purpose of the "legal system" and the justice system are to redress the kind of damages you have inflicted and stop malicious illegal and defamatory conduct such as yours that is clearly malicious and intended to destroy 100+ Abandoned Dogs and Amy Roman as a person

In "Allegation XII" in the Diana Peters matter you make several legally irrelevant but exquisitely ironic statements. While some of these statements may have limited relevance, one such statement is extremely relevant:

- You openly question Ms. Peters' mental health stating, "Darcy Ode Butkus is not trained in the medical field of Psychology, but questions the mindset that would conjure up such a notion."  This is quite ironic as we know that you, on at least one occasion, were Baker Acted for a mental health issue specifically regarding your ability to distinguish truth from fantasy. According to police accounts, officers were summoned to your residence regarding, "a female caller who believed she is God." Upon meeting with your then

husband, Arnold Butkus, who described you as "delusional," the police directly, encountered you. Officers personally observed you pacing back and forth naked. Officers observed you yelling,  "She does not want to do it"; "No, I am not going to do that to her";" God wants me this way!"; "I am God and I am going to do it!" Accordingly, based upon your "delusional thoughts," as the police dutifully put it, you were taken to Memorial East Hospital, in route to which, you told the officers that "God was telling you to do things that would change the world."

If and when 100+ Abandoned Dogs and Mrs. Roman sue you for defamation and defamation by implication, based upon your "defenses" raised in the Diana Peter's matter, you will predictably raise "truth" as a defense. At that time, you will put your medical history remarkable for delusional and erratic behavior and belief that you are God directly at issue as this background is material to the issue of whether you are capable of grasping reality and "the truth." Accordingly, 100+ Abandoned Dogs and Mrs. Roman will gain discovery power to access your medical records to prove their claims based upon your false and untruthful statements and present this information to a judge or jury.

### III.     Aggravated Stalking and Cyberstalking and Tortious Interference

As you are improperly and illegally defaming 100+ Abandoned Dogs and Amy Roman, your actions have no legitimate purpose. As such, in addition to a defamation action, you are hereby warned that you have incurred potential civil and felony criminal liability for stalking and cyber-stalking as well as liability for tortious interference with the organization's fund raising operations.

We understand that you and your cohorts are either directly or anonymously tracking the fund raising activities of 100+ Abandoned Dogs and Amy Roman on-line and actively sabotaging their fund-raising efforts. This activity includes contacting businesses who host fund raising activities and slandering 100+ Abandoned Dogs and otherwise extorting the businesses to cancel fundraising events for 100+ Abandoned Dogs by threatening to boycott the business or protest at or in front of the business.  This behavior constitutes aggravated stalking, which is a felony under Florida law.

We likewise know that you and your cohorts are monitoring 100+ Abandoned Dogs Facebook page and contacting followers with defamatory propaganda expressly or implicitly requesting that they not follow or support the dog rescue. This clearly constitutes felony cyberstalking under Florida law as well as tortious interference with the organizations operations.  Accordingly, if you do not immediately cease and desist from contacting 100+ Abandoned Dogs Facebook followers on 100+ Abandoned Dogs Facebook page or elsewhere we shall bring claims of cyberstalking and tortious interference against you based on these activities. As such, you are required to cease and desist from contacting 100+ Abandoned Dogs Facebook followers immediately.

13

If the foregoing activities do not immediately stop, we will use the court's subpoena power and our technology experts to track you and your cohorts down and reveal you behind your anonymous postings. Likewise, to the extent you are legally questioned under oath about your authorship of these posting and deny same, which later is revealed as untruthful, we will ask the court to sanction you civilly and criminally to the fullest extent of the law.

In closing, you state that "Darcy Ode Butkus has absolutely no interest in owning, or running an organization, most specifically . . . [a dog rescue]." You brag that you are "gainfully employed and enjo[y] a comfortable lifestyle, in a clean home . . . " Thus, it is quite ironic that you attack those who are willing to forego more lucrative gainful employment to run a dog rescue operation and who surrender the cozy confines of a "clean home" for a filthy, hot, and dangerous swamp filled with alligators, venomous snakes, and parasites as large as grapes to rescue the very dogs you profess to care about and want to save from behind your keyboard and microphone.

You may believe that you are G_d as you told the police. Or, you may believe that you were instructed by G_d to change the world as you told the police. Or, you may believe that your intermittent contribution to whatever dog rescue of your choice you deem worthy shows that you are a benefit to these unfortunate animals. But, in reality, you are a great detriment to these "voiceless creatures." In fact, the net result of your destructive and defamatory actions has likely resulted in many of these animals suffering and dying where otherwise they would have been saved and living in loving homes.  When you were attacking Diana Peters and her organization, Ms. Peters, or her supporters, put this sentiment well and revealed you to be a serial defamer:

> …Darcy Butkus…continually day and night posts un-documented slander, viscous lies and a total malicious attempt to discredit this dynamic dedicated dog rescue organization: Death Row Dog Rescue.  They illegally hide behind the Facebook sites and dozens of other vicious cites they have set up to do so much harm to so many dogs that have very little chances as it is to survive and be able to find a new loving family . . . they have caused the unnecessary death of may hundreds of adoptable dogs and puppies. These dogs and puppies would have lived but for the horrific lies [Darcy Butkus] has spread . . .

100+ Abandoned Dogs and Amy Roman strongly believe that through your defamatory actions and tortious interference with their dog rescue you have indeed caused the death of many animals that otherwise would have been saved. As such, 100+ Abandoned Dogs and Amy Roman view stopping you as integral to their mission to saving these abandoned animals. This mission does not represent the most "gainful employment" and cannot be done from a "clean home," or the ivory tower from which you cast your aspersions.  But, it represents the only hope for many of these dogs abandoned in the Everglades and surrounding areas. As such, 100+ Abandoned Dogs and Mrs. Roman will prosecute their claims against you to the fullest extent the law allows and will not stop until you are severely dealt with.

14

With this letter you are on notice of the defamatory actions. You are on notice that the previous "Allegations" you raised in the Diana Peters matter are not legally viable and do not justify your actions with regard to 100+ Abandoned Dogs. You are also aware that your actions may implicate you in criminal liability. As such, should you continue to conduct yourself in this manner, it will be clear that your actions and defamation of 100+ Abandoned Dogs and Amy Roman are willful, wanton, and malicious.

100+ Abandoned Dogs and Amy Roman hereby demand that you remove any Internet posts and any other media, which you have posted, authored, or to which you have contributed, either directly, or indirectly, and either eponymously or anonymously, that state or imply that 100+ Abandoned Dogs and Amy Roman are guilty of dishonesty, and cease and desist from making and further such statements on the internet and through any other media. Likewise, it is hereby demanded that you cease and desist immediately from contacting 100+ Abandoned Dogs commercial sponsors and those who would host their fundraising events as otherwise we will gather evidence to present to the State Attorneys Office to press charges against you and your cohorts for felony aggravated stalking.

Notwithstanding the foregoing, 100+ Abandoned Dogs and Amy Roman hereby reserve all their rights and remedies under the law.

**GOVERN YOURSELF ACCORDINGLY.**

Sincerely,

*Lorne Adam Kaiser*

Lorne Adam Kaiser
Attorney for the Firm

15